Good morning, Your Honor, and may it please the Court. My name is Brian House and I represent the appellant, Arkansas Times. With me today is Ben Weisner. I've asked the clerk to reserve five minutes for rebuttal. From the Boston Tea Party to the Montgomery bus boycott to the boycott of apartheid South Africa, consumer boycotts have been deeply embedded in American politics. In Claiborne Hardware, the U.S. Supreme Court unanimously held that the First Amendment protects the right to participate in these boycotts. Well, wasn't the holding there about the expressive conduct component of that particular boycott in Justice Stevens' opinion? Your Honor, the Supreme Court in Claiborne Hardware did recognize that participation in a politically motivated nonviolent boycott is expression on a matter of public concern and is therefore resting on the highest rung of the hierarchy of presumed evidence. But didn't the Court focus on the specific components or the elements of the boycott in that case? And that was the speech, the association, and those sort of clearly protected elements of that boycott. And my question is, does your client have similar elements that are evident in this case? Well, I think the question in this case, because it's primarily a facial challenge to the Israel anti-boycott certification form, is whether the act regulates an expressive, politically motivated boycott. And what Claiborne Hardware tells us is when you have a politically motivated consumer boycott, that is a form of expression on public issues. And here what the act regulates, and I think there's no dispute about this, is boycott, divestment, and sanctions boycotts targeted at Israel. And there's no dispute that those are politically motivated consumer boycotts. And that's exactly what this act regulates. Now in Claiborne Hardware, the Supreme Court specifically said that the act of withholding patronage from the boycotted stores was constitutionally protected activity. It held that Charles Evers, the boycott leader, could not be held liable for his speeches in support of the boycott, his participation at the meetings, or his active participation in the boycott itself. And the Supreme Court recognized that the power of the government to regulate economic activity could not justify a complete suppression of a non-violent, politically motivated boycott. And that's essentially the power that the government is claiming here, and that's the power that the district court's decision effectively gives it. Well, the statement that you just made is almost verbatim from Claiborne, where they say the state cannot regulate economic activity so as to prohibit a boycott that's politically motivated. But the district court then seized on the language that followed, which says, and to effectuate rights guaranteed by the Constitution itself. So the district court seemed to feel that that phrase had some significance to it, that we had to be talking about rights that the Constitution guaranteed to the boycotter. What's your response to that? While undoubtedly the consumer boycott at issue in Claiborne was a boycott to effectuate civil rights, the court did not hinge the First Amendment protection on that. It said that the boycott was a form of expression on public issues, essentially a form of political expression. And what the other Supreme Court cases tell us, for example, in Booz, the government was trying to regulate picketing of foreign embassies. And the Supreme Court said that picketing of foreign embassies is core political speech. It's still protests of foreign governments is just as much core political speech as protests of domestic governments. And so the question of whether the boycott is seeking to vindicate domestic legal rights was not, I think, the core issue in Claiborne. The question was whether it was a form of political expression. And protests of foreign governments, human rights protests of foreign governments, are, I think, a core form of political expression. And similarly in Beverly Hills Foodland, it wasn't a boycott seeking to effectuate a right to petition against governmental entities. It was a boycott targeting a grocery store for its unfair labor practices. And what this court recognized, citing Claiborne specifically, is that Claiborne recognizes that politically motivated consumer boycotts are entitled to constitutional protection. So I think the distinction there between a boycott focusing on civil rights versus a boycott focusing on other forms of political speech, all of those are protected. What the First Amendment recognizes, and I think the Supreme Court said this in Moseley, is that it's an equal playing field when it comes to the field of ideas. And we don't distinguish between one kind of political speech and another kind of political speech. And I think there's a good reason for that. It's partly because whether we recognize a boycott as advancing noble ends is going to depend on viewpoint. And we don't want courts deciding which boycotts are noble and which boycotts aren't. Instead, we look and say, is the boycott a form of political expression, or is it trying to advance some sort of economic self-interest? And that's really the line the Supreme Court drew in Superior Court trial lawyers. Does it matter that in Claiborne it was a matter of liability? And here it's a matter of just, well, you can't engage in this state contract if you engage in this kind of conduct. Is that distinction something that we need to focus on? I don't think it matters, Your Honor, because what the Supreme Court case has recognized, and this goes back to the old anti-communist cases, is that the government cannot condition a benefit on a contractor for swearing participation in constitutionally protected or association. So if boycotts are protected, then the government cannot require contractors to forswear participation in the boycott. If boycotts are not protected, then there's a separate compelled speech problem. But the unconstitutional conditions doctrine comes out differently. The district court interpreted the statute to say that the only thing that was prohibited was the actual refusal to engage in business dealings with Israel. Is that your reading of it as well? That's how the district court read the statute. I don't think the statute is just limited to that. Actually, if you look at the legislative findings in the statute, one of the things the government cites in support of the act is a congressional policy. I actually think it wanted states to examine contractors' promotion or compliance with unsanctioned boycotts of Israel. So I do think that if a contractor signs an anti-boycott form, and actually the anti-boycott form in the record in this case is a good example, it just says, I promise not to boycott Israel. It doesn't say, and boycott means this very specific thing. But doesn't the state statute have specific language? And what language can you point me to in the statute? Doesn't it define boycott in the statute? It does define boycott in the statute, Your Honor. So where's the broad language in the statute specifically? So, well, I think first the relevant language is in the form, because that is the thing that the contractor sees. And the contractor is signing a form that just says, I promise not to boycott Israel. But the language in the statute says, I believe it defines boycott to mean refusing to deal or taking other actions to limit commercial relations with Israel. And I certainly think it's conceivable that if you're picketing outside of Best Buy, saying don't buy Hewlett-Packard printers, because Hewlett-Packard has contracts with the Israeli Defense Forces, and your goal is to get Hewlett-Packard to cancel those contracts, then that is an action, arguably, to limit commercial relations with Israel. Now, did the district court find, though, that this was limited to economic activities? I'm unclear on that in my own mind. I do believe that in this case the district court found that the act was limited to the actual act of refusing to deal and said speech in support of the boycott would be protected. But again, the contractors are not seeing the district court's opinion. What they're seeing is a form saying, I promise not to boycott. Let's say that it is just as to the conduct of refusing to engage in business relations with Israel. How is that the boycott? How does the conduct of refusing to deal be a boycott standing by itself without the speech? So Your Honor, I think it's important when talking about a boycott, and the Supreme Court says this in Claiborne itself, that you can't isolate one of the parts. Boycotts take many forms, and they're supported by a bunch of different kinds of activity. Picketing, petitioning. I understand the district court in this case said those things are protected. Let me just interrupt quickly to make, I guess, the focus of the point. What if the statute just said you can't refuse to deal with Israel in business relations? I still think that at the very least, there would be an as-applied First Amendment challenge. As applied to people who are participating in nonviolent, politically motivated boycotts. So then you would have as-applied challenges to individual contractors, or people, or companies, but it would not be the facial that you're taking it on right now. You might have a substantial over-breath challenge as well, I think, and the argument would essentially be that really the focus of this statute, the purpose of this statute, is to get people to stop boycotting Israel, and so it's targeting that boycott activity, and if you outlaw the boycott itself, then all of the speech supporting the boycott is really not helpful. The core element of a boycott is the concerted refusal to deal, and that's what the Supreme Court in Claiborne called the constitutionally protected assembly, as opposed to the unlawful conspiracy. So if the government is targeting the core element of a boycott, and it's reason for doing so, and I think the government has been quite candid in acknowledging that it's reason for doing so is to suppress the boycott, then the statute is targeting an expressive boycott and it can't be applied. Are you making an as-applied and a facial challenge here? I believe we are making both, Your Honor. One of the arguments that's made is that if you engage in a boycott but nobody knows you're boycott, what's the point? Doesn't there have to be an expressive component? If I buy a printer from, I don't know, one of Hewitt Packard's competitors, you may not know it's because I'm boycotting Israel, it may only be because I think that's a better printer, or the cost is better, or for whatever reason. Doesn't there have to be an expressive component for it to be a real boycott? Well, Your Honor, I think in this respect, boycotts are like parades. The core element of a parade or a protest march is walking down the street. And if you zoom in and you just look at walking down the street and you say, well, they're just walking down the street, what's expressive about that? But then if you zoom out and you say, well, they're walking down the street with a thousand other people and those people are carrying signs and banners and they're chanting slogans, then that becomes expressive. But I don't think that's a good analogy, quite frankly, because you're talking about doing it with a thousand other people. That is expressive conduct. You're marching, you're chanting, you're doing something. But if you just don't buy a product because it's made in Israel, but don't tell anybody that's the reason you're not buying the product, what's the point of the boycott at that point? Well, I think in this context, Your Honor, the point is that the people who aren't buying these products are telling people that's why they're doing it. And they are doing it as part of a highly organized, highly expressive boycott movement, the Boycott the Rest and Sanctions movement. But your client's not, right? The plaintiff in this case is not. That is correct, Your Honor. Our client's not doing it. But the statute is targeting that activity. And if you look at the newspaper article the government submitted in the district court, and I think this is at JA81, the chief drafter of the bill basically said, our goal here is to target the Boycott the Rest and Sanctions movement. And so that is what the statute's seeking to regulate. Now it's true that our client does not currently have plans to boycott Israel. But it doesn't want to surrender its First Amendment rights to participate in a boycott. And just as I think you don't have to be a communist to object to an anti-communist certification, you don't have to be a BDS participant to see the First Amendment problem and to object on First Amendment grounds to being forced to disavow your right to boycott. What does it mean in the definition of boycott that it means engaging in a refusal to deal with persons or entities doing business in Israel in a discriminatory manner? What does that mean? Does that mean that, so what's the process for that? Was this discussed at the district court? So you say, look, I'm not going to purchase computers, printers from certain companies. Well, I'm accused of doing that because I'm trying to boycott Israel. No, I really like this other computer printer better. Was this fleshed out at the district court on how that would even be determined? The district court did ask what in a discriminatory manner meant. We provided our interpretation and the government provided its. I think if you look at the legislative findings from the act, I think it's legislative finding number five. It says contractors who participate in boycotts of companies that operate in Israel or in territories controlled by Israel, meaning the Israeli settlements, they are effectively engaging in a form of national origin discrimination. So I think what it means is if you're refusing to buy from these companies as part of a boycott, that's discriminatory. You see similar exceptions in other statutes. The statute does not apply to boycotts or refusals to purchase for valid business reasons. So if a company refuses to buy a Hewlett Packard printer or a printer from an Israeli company because it's more expensive than another one, the statute doesn't compel them to buy the Israeli printer. What the statute says, if you're refusing to buy the printer because the company operates in connection with the Israeli government or operates in the Israeli settlements or as outlawed. So I think in a discriminatory manner, it really just means as part of a boycott. I want to go back to Judge Molloy's question about whether you need explanatory speech, because I think, Judge Molloy, you were getting at Rumsfeld versus Fair. The Supreme Court there says, Chief Justice Roberts says, that often it's going to be the case that people want to express a message by engaging in conduct that's not ordinarily expressive. And the fact that the conduct requires explanatory speech is good evidence that the conduct is not inherently expressive. But I don't think the Supreme Court was making a categorical rule there that any time you engage in conduct that has some speech accompanying it, that it's therefore not subject to O'Brien scrutiny. And in fact, even in Rumsfeld itself, the court said, alternatively, the government's statute here can survive O'Brien scrutiny because there is a compelling government interest unrelated to free expression, the interest in raising and supporting the armies. But I don't think Justice Roberts was suggesting, for example, that participating in a parade is not expressive because other people are the ones who are engaging in speech surrounding the march. And so I don't think that that guideline there was meant to lay out a categorical rule. And I certainly don't think it was meant to overrule Claiborne. I mean, the Supreme Court knows how to overrule its own opinions if it wants to. It doesn't overrule them sub salientio. And Agostini versus Felton says that even if Rumsfeld and Claiborne are in tension, this court must still apply the precedent that directly controls. And that's Claiborne Harbor, which directly concerned a nonviolent politically motivated boycott. And that's exactly what we have here. If the court has no further questions, I'll reserve my time. Thank you. Mr. Brony? Morning, Your Honors. May it please the court. My name is Nicholas Brony. I'm the Solicitor General of Arkansas, and I'm here on behalf of the defendants. Your Honors, the district court below correctly concluded that refusing to buy or sell goods or services based on national origin is neither speech nor inherently expressive. That's true whether the refusal is motivated by politics or prejudice, whether it's individual or collective, and whether it's called a boycott or it's called something else. Well, why does the state use the term boycott when it seems that the statute could simply read, as you introduced your argument here today, why use the word boycott? That does seem to pull in a lot of expressive conduct, as Claiborne has described. I think Your Honor's right. The statute could have been drafted somewhat differently. But I think the fact that the statute defines boycott as a refusal to to deal resolves that issue. I think merely using the term boycott without defining it really doesn't show very much. And I think opposing counsel's reliance on the term boycott in order to just assert that everything is protected is really sort of a stretch of an argument when the state very narrowly defines what's prohibited here as a refusal to deal essentially based on national origin. How do you interpret the or other actions section of the statute? Is that, in your view, I assume, limited to commercial action? That's correct, Your Honor. And what did the district court base that finding on? The district court based that on the statute itself. It's a statute that deals with commercial conduct. It deals with refusing to the elements described in the statute are refusing to deal. And then there's a divestment section. So it's a it's a statute that's targeted at commercial conduct. There's the word other in there is just a capsule for that commercial conduct. I think you have to read the statute consistent with the other words in it. And obviously, if Your Honor's believe that could be a problem, the canon of constitutional avoidance, as the district court pointed out, would avoid any any speech limitations. But I think it could be fairly read, though, to prohibit advocating for a boycott as well. And, you know, to use the example of your opponent, that if you wanted to pick it best by an advocate that people not buy Hewlett Packard printers because of their connection with the Israeli military, I think that that's arguably within the other action section of the statute. I respectfully disagree, Your Honor. I don't think that that's covered by the statute. The position of the state of Arkansas and the way the district court has interpreted that is it doesn't cover speech. It doesn't cover traditional advocacy. And again, the statute is directly aimed at conduct. I would actually go so far as to say, Your Honor, if if they if for some reason the Arkansas Times did decide to participate in the boycott or suddenly decided to advocate boycotting, they could they're free to run an ad or an article alongside each and every advertisement for Pulaski Tech, arguing for a boycott of Israel, arguing for the merits of discrimination based on national origin, calling for the repeal of Arkansas law, as they've done multiple times here. It's simply not covered by the statute. And it's not the view of the state of Arkansas that it would be covered by the statute. Instead, what we have here is an ordinary refusal to deal. We have ordinary commercial conduct. So we really have what was at issue in FAIR, a simple refusal to deal. And as FAIR tells us, a refusal to deal in and of itself is not inherently expressive. Instead, it requires speech in order to explain it, to understand, as Judge Malloy was pointing out, to understand whether or not this is meant to be expressive or to understand that they are intending to communicate something. We all engage in ordinary commercial transactions on a daily basis. We engage probably in hundreds of them on a monthly basis. We make decisions about what to buy or what not to buy. Nobody is going to believe that those transactions are intended to convey a message absent speech explaining it. And because it requires speech, we're really, this is exactly like FAIR. In FAIR, the law schools essentially made the exact same argument that the Arkansas Times is making here, that they are engaged in a politically motivated boycott. They wanted to express their opposition to the military's employment policies. But that was the law school. This is arguably, at least from a legislative history, an entire movement, a boycott that is much bigger than just Arkansas Times or even Arkansas. So isn't that a distinguishing feature, that there are aspects of this boycott that are bigger, broader and more expressive than in FAIR? So I guess there are two responses to that. One, Your Honor, the boycott in FAIR was certainly part of the movement as well. It was a movement that involved virtually every law school in the country, wanting to express their opposition to the military's don't ask, don't tell policy. It was also part of a general movement to oppose those policies and to get the military to repeal it. Second, to the extent that there's other stuff involved here other than just the refusal to, the boycott movement generally involves things other than just a refusal to deal. Those things are often, are mostly protected. I mean, we have to talk about specific examples. But again, the advocacy, opposing Israel, opposing, expressing hostility toward Israelis, arguing for the merits of discrimination based on national origin. Those things, those traditional speech elements are protected. And that, that's really, that distinguishes this case or puts this case sort of like Claiborne in the sense that Claiborne also distinguished those elements. Claiborne didn't hold that the boycott entirely, everything that involved was protected by the First Amendment. Instead, Claiborne was very specific to say that there are many elements that are involved here. There are traditional speech elements, the advocacy itself, the participation in meetings, the association, the assembly, the petition. But what Claiborne does not say, and they can't point to a single passage in Claiborne that says a refusal to deal is protected by the First Amendment. And that makes sense because the Mississippi state courts had concluded that as a matter of state law in that case, that a voluntary withholding of patronage under Mississippi law was not a basis for liability, whether that was individual or collective. But you say there's no language in Claiborne, but what, what about the language that they basically quoted from Claiborne, which says the right of the states to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force government, governmental and economic change. I mean, isn't that exactly what the boycott of Israel is intended to do, to force government and economic change? I think, Your Honor, it, it, it has, it has, that language has to be read in context. That language has to be read in the context of the preceding pages that discuss the individual elements. I mean, the Supreme Court begins by saying there are many elements at issue here, some of which are protected, some of which are not, and then goes through the individual elements. It says, for instance, the, the advocacy is pure speech. It's protected. Now there's an analysis about whether or not it's an incitement to violence, which was sort of the argument that the Mississippi Supreme Court was making, was that the advocacy somehow incited violence and the Supreme Court rejected that and said there's not a close enough nexus. But I think that language, Your Honor, has to be read in context, but where it goes through the individual elements. But even if you disagreed with that, I, I agree that Claiborne uses broad and sweeping language, and I think that's understandable given the context of that case. I mean, this is a civil rights case that comes out of Mississippi in the 1960s and 1970s, and I think it's understandable that the Supreme Court would, would paint in such broad strokes to make very clear that what happened in Mississippi would not be acceptable. And I think you have to read that language in that context, and frankly, I think that's the way Superior Court trial lawyers reads that language. Additionally, that language also has to be squared with other precedents. It has to be squared with longshoreman and fair. Longshoreman is another case that involved a politically motivated boycott with a secondary boycott just like this aimed at a foreign power. Indeed, as the district court pointed out, all you have to do is change the, the terms. You, you substitute Israel for the Soviet Union, Afghanistan for the Palestinian territories, and we essentially have the same thing here. That was another case that involved, again, a politically motivated boycott aimed at a second, at a foreign power in order to change their policy. And the Supreme Court said it was not protected by the First Amendment. And Claiborne has to be read in conjunction with that. But Claiborne did find that the economic activity of boycotting the businesses was protected, did it not? It did not. Well, if they would not, then why would they have not, why did they vacate the judgment? They vacated the judgment because if you're, the latter passages, what the Mississippi state courts were saying is under Mississippi state law, they couldn't be held liable for withholding patronage. So that issue simply wasn't before the court. What the court then does is it goes through each of the, the Mississippi courts had held that it was tortious interference with plaintiff's business. That was the claimant issue. The Mississippi state court said that the predicate for that was the violence. And it basically said that, that the speech, the advocacy, the boycott itself, everything here was designed to further violence. And what the Supreme Court said is no, in order to make the claim that you can regulate speech because it leads to violence, you have to show a close nexus because we're talking about constitutionally protected advocacy, association, et cetera. And the court rejected that argument and said, there's not a close enough nexus. And I think the passages your Honor is referring to really go to that point. Well, but they go a great length, they go to great length in Claiborne to talk about the economic effect of withholding your business from the Mississippi businesses and that they vacated the judgment in favor of the businesses and said, you can only get a judgment if you engage in violence. And they said in the opinion that there was very little of that, but there might've been some, but the bulk of the judgment was vacated. That's correct, your Honor. But I think the predicate for the liability, the Supreme Court discusses at length, the different categories of things that people were held liable for, because it wasn't clear, even at oral argument, what people had specifically been held liable for. But there, there again is no finding because it couldn't, because under Mississippi law, you couldn't be held liable for it. There's no specific finding that a refusal to deal based on race, which was that issue there, is protected by the first amendment. That finding is simply not there. And again, to go back to Longshoreman, as Longshoreman explains, the refusal to deal is designed, it's conduct designed to coerce. It's not something designed to communicate. And that you have to read Claiborne consistently with Longshoreman. Now, I understand that they attempt to distinguish Longshoreman and Fair on the grounds that this is a consumer boycott, that somehow this is different from, from the conduct and issue in those cases. Frankly, your Honors, that distinction makes very little sense because an observer is far more likely to notice military recruiters interviewing elsewhere or a number of ships sitting in port loaded with cargo flying the Soviet flag than it is to notice what a contractor does not buy. And that means that ultimately the problem here that they have is the exact same problem that the boycotters in Fair had. It's that without an explanation, nobody's going to notice the conduct. That's particularly true here. And nobody's going to understand that it's intended to be communicative. The most communicative element of what's at issue here is the communication itself, opposing Israel and explaining why. And that means- Part of the problem, I think, of your argument though, is that there's two components to the statute. There's the anti-boycott component, but there's a second component which says you have to then certify to the state whether you're boycotting or not. Doesn't that then bring in the communicative aspect of the boycott? You have to put out a public document that says, yes, we are boycotting or no, we're not boycotting. On the compelled speech issue, your Honor, it's an ordinary certification of the type that governments require for all kinds of contracts. It's the type of certification that's routinely required. It's not a political message. I mean, it would be like when I register to vote, I have to certify I'm over the age of 18. I don't necessarily believe that you should have to be 18 to vote. It doesn't say that. It just says, here's a statement of fact. I'm certifying the fact that I'm over the age of 18. And that's really the difference here is that you're certifying the fact. You're not making a political statement by just certifying the fact. The same thing is true in federal contracting. When you contract with the federal government or you obtain funds from the federal government, you have to certify that you do not discriminate. That says nothing about whether it doesn't affect your first amendment rights to disagree. You may be the worst segregationist in the world, but you're still required to certify. It doesn't affect your first amendment rights. And that's the distinction there, your Honor. In addition to that, as I mentioned, their reading of Claiborne obviously can't be squared with other boycott cases. I also don't think it can be squared with anti-discrimination precedents. So if I understand that they attempt to limit anti-discrimination precedents to the public accommodation context and to the direct employment context in order to distinguish Title VII in cases like that, but frankly, your Honor, that distinction makes absolutely no sense because their argument would mean that an employer or the state could prohibit an employer from refusing to hire based on racial prejudice, but that the state could not prohibit that same employer from refusing to work with suppliers for the exact same racially prejudicial reason, even though the substance of those two transactions is identical. Indeed, it's very difficult to understand how they believe even Title VII's prohibition on national origin discrimination could possibly survive the reading of Claiborne. And the reason for that is a boycotter could always claim that his refusal to hire an Israeli was part of the boycott itself. Is there a problem though with the fact that you are signaling out a particular country and a particular religion and that if you had a statute that says you cannot boycott and refuse to do business based upon religion, I think that would be constitutional, I don't want to opine, but I think that would pass muster. But to say, well, you can't discriminate and refuse to do business with Jews and Catholics, but you can discriminate and refuse to do business with Protestants and Muslims, I mean, would that make any sense? So, Your Honor, the way that the precedents in the anti-discrimination cases work is actually the government can make a determination to target certain conduct and then other conduct. But they can't do it based on religion. No, they couldn't do it based on religion. And that's what you're doing here. At least that's what a lot of the MECAs are saying you're doing here. But to use, and that would be problematic for other reasons under the first amendment, but for instance, in the age context, the government has banned age discrimination for older Americans, but not for younger Americans. And that's never been viewed as constitutionally problematic. And really the point here is that the government is targeting the conduct. It's not targeting the expression and it's well established that the government may target conduct, even if it's doing so because it disagrees with anything else. I mean, I don't disagree that the state of Arkansas is sending a message, but it's sending a message in the same sense that hate crimes legislation sends a message, it's targeting the conduct, not the expression. We're not barring the expression of ideas. And that's what all of the anti-discrimination precedents hold. You can regulate the conduct, even if you can't regulate the expression of the ideas that underlie that. Also with respect to targeting here, the same was true of the Solomon amendment, the Solomon amendment was obviously in response. It was directly in response to the, the law school's boycott of the military. In fact, the ACLU's own briefing in that case made an argument that it was content based, it was viewpoint based, it was designed specifically to target this specific speech and the Supreme court rejected that unanimously and said, what's at issue here is conduct, not expression, because the most expressive element is the explanation itself. And that that's what distinguishes this. The, the rule that they're arguing for, coming back to the discrimination point, has a number of implications. If it were to be adopted outside of even the title seven, take for instance, somebody who wanted to make a point about immigration, somebody who wanted to say that immigration laws are too lax. They refuse to hire people based on who are of Mexican origin because they want to protest immigration. If you adopt their rule, that means their conduct is protected because it's explained to be expressive. The flip side of that is also true. Somebody could hire an illegal alien and say, I want to make a point about how I support open borders. And I'm explaining that therefore it's expression and it's protected, or at least you have to apply additional scrutiny. The, in other contexts, imagine the same sex marriage cases. This is obviously an area that involves a lot of cases. Say you had limousine drivers who said we're boycotting the same sex marriages and refused to participate in same sex marriage ceremonies, that the government can obviously prohibit that conduct without running afoul of the free speech clause, and that's just the implications of the rule that they're arguing for. It has a number of dangerous connotations associated with it. It essentially means that somebody can always transform their conduct into expression by merely explaining it. How, in the definition of boycott Israel under the statute, it ends with this phrase in a discriminatory manner. That really does seem like it's looping back into the idea of a boycott. How, how does the state anticipate or how has the state applied that and determined whether or not someone is refusing to do business based on a discriminatory reason? I think actually this is probably one of the points of agreement between us and the other side is that that language is meant to differentiate between things that are not based on national origin discrimination, but instead are just ordinary business decisions. If you're making a decision, you want to buy, instead of buying a Hewlett Packard printer, which is the only example I can think of off the top of my head, I'm making a decision to buy say an Epson printer instead. I'm doing it for a business reason because it's better price, it's better quality, better supply chains, et cetera. That's what that language is meant to do is it differentiates between things that are done for national origin discrimination purposes and then other purposes. That, that seems right for dispute. I could say to you, it's because I like the other type of printer better. I mean, it seems to be getting into the intent of, of the contractor. It seems like a difficult arena to be wandering around and to try to determine why in fact I'm refusing to deal with Israel. It could be, but in just the same sense that the same is true for hate crimes context, we, we differentiate between motives all the time. And again, we're allowed to do that under the first, it's not a first amendment problem because we've targeted the conduct and not the expression itself. And again, that's really the lesson of FAIR. And that's why this case is, is basically FAIR or longshoremen is we're, we're targeting the conduct. We are not targeting the expression. They are free, contractors remain free to voice any opinion they want without running afoul of state law here. Alternatively, and briefly, I wanted to address an alternative ground for affirmance here. And that is the government's broad power to impose contracting conditions or funding conditions that the district court didn't reach. Obviously the state has broad power in, in deciding how to fund things. If you accept their, their argument that a boycott is expressive, then Arkansas is certainly not required to fund that expression. That's the lesson of the government speech cases. Is there any questions? Thank you. Thank you. Just a few quick points, Your Honor. Counsel, if I may, would you address the compelled speech issue? I'm having a tough time with that. Why isn't that just as the state describes here, a certification that's typically done in a variety of government programs, what's the key issue with submission of that certification? So I think there are two issues with the submission of certification. The first is when you're submitting a certification regarding activity, this at least vaguely applies to protected expression, supporting the boycott, for example. What the Supreme Court has told us is that in cases like Bagot versus Bulletin and NAACP versus Button, when people make an oath to the government, they're going to be very wary of violating that oath. Nobody wants to be accused of lying to the government. And they're going to steer very far away from the prohibited line. And they're not even going to engage in stuff that the law might not prohibit. And I think Harmon versus City of New York is also relevant on this point. They're not going to engage in stuff that the law might prohibit in order to avoid being accused of having violated their government oath. And so here, a contractor who sees a form that says, I promise not to boycott Israel, is going to, I think, rationally conclude that if I go out and start participating in BDS protests, that I could be accused of boycotting Israel. All of a sudden, the government's going to start looking at my consumer choices and say, hey, have you bought any products from Israel lately? Why haven't you? And I'm going to be very worried about that. So the function of the law, I think, is effectively, even if the court concludes that participation directly in the boycott is not speech, the function of the law will be to police speech. And the law also effectively requires contractors to take the government's side in this ideological debate. And that's what the other district courts, every other district court who have considered this issue, has held, is that the anti-BDS certification is effectively the government dragooning contractors onto its side and saying, I also will not participate in boycotts of Israel. It's requiring them to raise their hand. The second reason I think it presents a problem is it's requiring contractors to provide a piece of private personal information that's highly controversial. And what the Supreme Court tells us in cases like Zouder and what district courts in cases like Southeast Builders and Contractors versus Rung is that when the government requires a contractor to disclose controversial information of that nature, the government has to at least have some reason for doing it. And here, the government hasn't provided really any reason. The government has not really attempted to sustain any of its asserted interests, and its asserted interests in this case have shifted from promoting trade policy to anti-discrimination interests to enforcing federal policy. And the government has never demonstrated why it has an actually compelling or substantial interest in any of those things. I want to touch briefly on the government's anti-discrimination interests. The government characterizes this as an anti-discrimination statute, but I don't think it really is. They call this a form of national origin discrimination, but the statute does not prohibit discrimination against businesses based on Israeli national origin. It prohibits boycotting businesses that do business with Israel, in Israel, or in Israeli territories. So for example, boycotting an American company because it operates in the Israeli settlements or because it has business contracts with the Israeli government is prohibited under the statute. Similarly, if this were an anti-discrimination statute, one would expect, as Judge Molloy was pointing out, that it would protect a certain characteristic. That's usually how anti-discrimination statutes work. They protect religion or race or ethnicity. This is a statute singly targeting boycotts of one country, Israel. The state has not supplied any evidence even that boycotts of Israel pose a particular economic threat to Israel. In fact, the chief drafter of the bill said that he wasn't aware of anybody boycotting Israel. He was taking this as a prophylactic measure. The fact that there is no evidence for any legitimate governmental interest here, I think, strongly supports the conclusion that what the statute is really targeted at is expression. It's targeted at viewpoint discrimination. The government is effectively picking sides in boycott movements. And if the government gets the power to do that in this case, it's very easy to imagine the government assuming that power in other states where they say, look, you can't boycott Planned Parenthood. You can't boycott health care providers on the basis that they provide abortion. You can't boycott the companies that do business with the NRA. You can't boycott companies on the basis of their association with advocacy groups that promote Second Amendment rights. Americans engage in boycotts across the political spectrum. And if the government has the power to selectively target particular boycott movements for suppression, which is what the government is claiming here, then we'll likely see legislators in all different states suppressing boycotts based on their political whims. And so in closing, Your Honor, I just want to say that it's not for nothing that we say that people vote with their pocketbooks. Boycotts are an expression of popular sovereignty. They're an embodiment of we the people. And the district court's decision here effectively gives the government an opportunity to pronounce those voices based on nothing more than viewpoint discrimination. Unless the court has further questions. Thank you. Thank you. Thank you to both parties for your briefing and argument. And we'll take the matter under advisement. Can we call the next case please?